

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-22-00123-CV

**IN THE MATTER OF THE MARRIAGE OF JOSHUA CHASE DRAPER AND HALEIGH ELIZABETH DRAPER AND IN THE INTEREST OF R.L.D. AND K.R.D., CHILDREN**

On Appeal from the 360th District Court
Tarrant County, Texas
Trial Court No. 360-677390-20, Honorable Patricia Bennett, Presiding

February 21, 2023

## MEMORANDUM OPINION[1]

Before QUINN, C.J., and PARKER and DOSS, JJ.

Joshua Chase Draper appeals from a final divorce decree. The latter ended his marriage to Haleigh Elizabeth Draper. Their union resulted in the birth of two children. Furthermore, its tenure encompassed instances of discord, drug use, and physical abuse by both parties, according to the appellate record. Through five issues, Joshua questions various aspects of the decree, including its designation of conservatorship, the geographic restriction imposed, and the property division struck. We affirm.

---

[1] Because this appeal was transferred from the Second Court of Appeals, we apply its precedent should it conflict with that of the Seventh Court of Appeals. TEX R. APP. P. 41.3.

***Issue One***

Joshua initially asserted that the trial court abused its discretion by appointing both parents joint managing conservators of their children. He believed that wrong "given the finds [sic] that [Haleigh] had committed family violence."[2] We overrule the issue.

Statute provides that a trial "court may not appoint joint managing conservators if credible evidence is presented of a history or pattern of past or present . . . physical or sexual abuse by one parent directed against the other parent, a spouse, or a child . . . ." TEX. FAM. CODE ANN. § 153.004(b). Per that statute, we concluded that the appointment of joint managing conservators constituted abused discretion when the record contained credible evidence of a history or pattern of family violence, which could consist of one instance of violence. *In re Marriage of Stein*, 153 S.W.3d 485, 489 (Tex. App.—Amarillo 2004, no pet.); *accord, Gerges v. Gerges*, 601 S.W.3d 46, 62 (Tex. App.—El Paso 2020 no pet.) (stating that "a trial court may find that a parent has a 'history' of engaging in conduct even though the parent may have only engaged in a single act"); *Chacon v. Gribble*, No. 03-18-00737-CV, 2019 Tex. App. LEXIS 10286, at *11 (Tex. App.—Austin Nov. 27, 2019, no pet.) (mem. op.) (noting that the trial court has the discretion to determine whether a single incident, as well as multiple incidents, of family violence evinced the requisite history or pattern). Yet, like *Chacon*, authority of the court from which this appeal was transferred grants trial judges discretion to assess whether one incident alone is enough. As said in *C.C. v. L.C.*, No. 02-18-00425-CV, 2019 Tex. App. LEXIS 5615 (Tex. App.—Fort Worth July 3, 2019 no pet.) (mem. op.), "we do not interpret the word 'history' to mean that a single event must constitute a history that deprives the

---

[2] He said nothing about the finding that he too committed family violence as barring the appointment of joint conservators.

2

trial court of any discretion to appoint joint managing conservators." *Id.* at 2019 Tex. App. LEXIS 5615, at *38. Being bound by *C.C.*, *see* TEX. R. APP. P. 41.3, we heed it here, and, in doing so, note the following.

The trial court expressly found that "[b]oth parents committed family violence . . ." though "[n]either . . . had a 'history or pattern' of [it]." Other findings intimated that it found the family violence a one-time event. For instance, it wrote that "[n]o other party intervened nor was there sufficient grounds to call CPS from *a one-time event* that was not likely to occur in the future." (Emphasis added). Yet, Joshua argues that additional assaults by Haleigh had occurred. Our review of the record disclosed that the evidence he cited to us came from his own testimony. Moreover, the trial court openly questioned his credibility about it and other aspects of his testimony.[3] Indeed, the trial court's doubts about Joshua's veracity influenced its decision to appoint an amicus. Given those doubts, it was free to discredit the other alleged examples of violence he iterated. *See In re E.D.,* No. 02-20-00208-CV, 2022 Tex. App. LEXIS 87, at *29 (Tex. App.—Fort Worth Jan. 6, 2022, no pet.) (mem. op.) (noting the trial court's "better position to observe and assess the witnesses' demeanor and credibility"). And, we defer to its credibility choices. *Id.* So, that leads us back to a sole act and the holding in *C.C.* that a single act does not necessarily constitute a "history" of misconduct. Joshua does not address *C.C.* or explain why the one incident involved here must be deemed a "history" under the *C.C.* equation.[4]

---

[3] The comments evincing as much consisted of the court saying: 1) "I'm feeling very uncomfortable. There are several things. One is the father wanting to blame the mother for everything . . ."; 2) "[b]ut everything seems to be the mother's fault and nothing seems to be the father's fault . . ."; 3) "as things are lobbed against Ms. Draper, she's been very quiet. I've not seen anger on her face"; and 4) "[y]ou say anything about Mr. Draper, and the anger I see in his face is very concerning to me."

[4] Indeed, this case illustrates the importance of precedent and utilizing that of the court adjudicating the dispute to formulate one's argument.

And in deferring to the trial court's authority to discredit Joshua's testimony about other incidents, we cannot say he proved an instance of abused discretion.

### Issue Two

Through his second issue, Joshua alleged that the trial court abused its discretion by imposing an arbitrary geographic residency restriction. The restriction at issue states: "neither parent shall have the right to designate the primary residence of the children, but the children shall remain within the Eagle Mountain Saginaw ISD." More importantly, he agreed to it, as evinced on page ten of volume five of the reporter's record. Having so agreed, he cannot now complain about it. *See Guidry v. Guidry*, No. 04-20-00311-CV, 2022 Tex. App. LEXIS 4977, at *7 (Tex. App.—San Antonio July 20, 2022, pet. denied) (mem. op.) (stating that "[u]nder the doctrine of invited error, Margaret cannot be heard to complain that the decree—the terms of which she previously agreed to—is not enforceable").

### Issue Three

Next, Joshua argued that: "[a]s established by the recommendations of the Amicus Attorney, the weight of the evidence supported that it was in the children's best interest that Appellant be appointed as the party with the exclusive right to designate the primary residence of the children and that Appellee have a standard possession order."[5] Because the trial court opted not to follow the recommendations, the court purportedly abused its discretion. We overrule the issue.

---

[5] The amicus also recommended that both parents have joint managing conservatorship over their children.

The lower court ordered that neither parent have the exclusive right to designate the primary residence of the children. Instead, it directed that "the children shall remain within the Eagle Mountain-Saginaw ISD." Nor did the trial court implement a standard possession order. In lieu thereof, the parents where awarded what the court labelled "Week On/Week Off." Interestingly, Joshua says nothing about his having approved the "week on/week off" or "50/50" periods of possession when testifying. He did initially voice his preference to possessing the children during the week and leaving Haleigh with the weekends. But, he followed that with 1) "I'm fine with the 50/50" and 2) "[a]bsolutely" when asked "if the Court does decide to continue the 50/50, will you follow those recommendations of the Court."[6] Having told the court he was fine with sharing possession of the children "50/50," he again invited the trial court to institute the possession order it did and, thereby, deviate from the standard possession order. Thus, he cannot now complain about its accepting the invitation. *Guidry*, *supra.*

As for the remainder of the issue, amicus attorneys, like that appointed at bar, serve the court, not the parent or child. *In re R.H.B.*, No. 04-21-00038-CV, 2022 Tex. App. LEXIS 2135, at *22 (Tex. App.—San Antonio March 30, 2022, no pet.) (mem. op.). They assist the trial court in fostering the child's best interests. TEX. FAM. CODE ANN. § 107.001 (defining the role as an "attorney appointed by the court . . . whose role is to provide legal services necessary to assist the court in protecting a child's best interests . . . ."). Yet, they are not the court. And, though Joshua insinuates that the recommendations somehow impose an evidentiary burden upon a parent to prove the recommendations wrong, we would have welcomed citation to legal authority so stating.

---

[6] The trial court wrote in its findings: "[a]t [the] last portion of final trial the father testified that he believed that 50/50 visitation was working, and he believed that should continue."

None was cited, possibly for the reason that recommendations of the amicus attorney are just that, recommendations without binding effect.

So, we reject the notion posed by Joshua. A trial court does not abuse its discretion when deviating from a recommendation of an amicus after it wades into the stormy sea of child custody and exercises its own judgment. This is especially so where, as here, that sea contained evidence of 1) Joshua's "homicidal and suicidal ideations," 2) an earlier instance of Joshua strangling a prior wife, 3) a witness assigned to evaluate custody voicing "concerns about alienating behaviors between the father and the children," and 4) Joshua and one of his children "hav[ing] a very maladaptive attachment." The trial court undoubtedly sought to have both parents engage with each other in the rearing of their children when neither parent was faultless. We do not see that as a decision illustrating abused discretion under the circumstances here.

### *Issue Four*

Joshua next believed that "[t]he trial court abused its discretion in modifying child support arrearages without a proper request for relief." Allegedly, he illustrated that Haleigh owed "$3,735.96 in past due child support arrearages." Yet, the trial court awarded him none.[7] We overrule the issue.

The purported arrearage encompassed child support apparently ordered via a temporary order. Upon conducting its final hearing and through a document entitled "Rendition After Final Trial on the Merits," the trial court found that both parents had interim, outstanding child support obligations. Following that, it said: "[t]his Court finds the parties have had a 50/50 possession, and as a result of possession credits, the child

---

[7] Nor did it award Haleigh arrearages that he owed.

6

support arrearage and medical support arrearage for both parents is zero." This finding occurred after Joshua had responded to questions about an exhibit depicting Haleigh's arrearage. The response consisted of his testifying: "I thought it was all -- all basically a wash. I thought it was canceled out." Again, it appears that the trial court simply followed Joshua's lead. He thought the arrearage was "a wash" and "canceled out," and the trial court made it so. And, we encounter no argument from Joshua about the trial court's lacking authority to offset competing arrearages when settling the marital estate. In short, a trial court does not abuse its discretion when its decision has evidentiary support. *In re R.R.K.*, No. 02-20-00302-CV, 2022 Tex. App. LEXIS 2860, at *8-9 (Tex. App.—Fort Worth April 28, 2022, no pet.) (mem. op.). The testimony of Joshua provided the requisite evidentiary support and, therefore, insulated the trial court's decision from attack.

### Issue Five

Lastly, Joshua posited that "the property division in this case was so disproportionate as to constitute an abuse of discretion." This was purportedly so because the trial court awarded him a house without equity, directed him to sell the house, obligated him to pay for the house until sold, failed to obligate Haleigh to return government stimulus checks sent to the family, and allowed her to keep their 2013 Cadillac without accompanying the award with a directive that she somehow remove him as an obligor on the debt. We overrule the issue.

A trial court must divide the marital estate in a way it deems just and right, while having due regard for the rights of each party and the children. TEX. FAM. CODE ANN. § 7.001. Moreover, we presume that the division made falls within those parameters until shown otherwise. *Martinez v. Martinez*, No. 02-21-00353-CV, 2022 Tex. App. LEXIS

7

9529, at *13 (Tex. App.—Fort Worth Dec. 29, 2022, no pet.) (mem. op.) (quoting *Loaiza v. Loaiza,* 130 S.W.3d 894, 899 (Tex. App.—Fort Worth 2004, no pet.)). So too does authority hold that the division need not be equal to be just and right. *Martinez*, 2022 Tex. App. LEXIS 9529, at *12.

In determining how to arrive at a just and right split, the trial court may consider a myriad of factors. They include such things as 1) each spouse's earning capacity and financial condition, 2) the respective abilities, education, and business opportunities of each spouse, 3) the size of their separate estates, if any, coupled with any future need for support, 4) the respective health and age of the spouses, 5) the award of child custody, 6) the length of the marriage and fault, if any, in its end, 6) attorney's fees, 7) a spouse's dissipation of the marital estate, if any, and 8) tax consequences, if any. *Id.* And, no single factor controls. *Id.* Finally, the burden lies with the complaining party to illustrate that the division struck was so unjust that the trial court abused its discretion, i.e., it acted unreasonably or arbitrarily. *Id.* at 2022 Tex. App. LEXIS 9529, at *13. That said, we turn to Joshua's issues.

Joshua's efforts to illustrate an arbitrary division focused only on the few circumstances we mentioned in the opening paragraph to this issue. Nothing was said about the factors mentioned in *Martinez* or how any favored his position. Nothing was said about the size of the marital estate and other property or debt assigned to each spouse. Nothing was said about the percentage of the estate each received or the respective value of those percentages. Nor did he address the disparity in the income potential between him and Haleigh. According to evidence of record, Joshua had a steady job and his income ranged from $65,000 to $83,000 per year. Haleigh cleaned

8

houses and bartended. She also testified that her employment experience was minimal. Other evidence indicated she was preparing to file for bankruptcy.

He received the house per his request; she did not. Having received the house and ability to live in it until sold, one could say it was reasonable for him to carry its debt during the interim. This seems especially so when Haleigh informed the court that she could not afford the abode and was living with her mother in an apartment.

As for the allegation about there being no equity in the home, evidence indicated the outstanding mortgage approximated $185,000, while the appraisal district valued the abode at $174,000. Yet, the trial court noted the recent rise in housing prices. Furthermore, as the court attempted to gather information about mortgage debt and home value, Haleigh's attorney said a particular real estate website valued it at $243,900. No objection to that was heard from Joshua's attorney. As said by our sister court, "[w]hen, during an evidentiary hearing, counsel makes unsworn factual statements as an officer of the court, on the record and without objection from opposing counsel, such statements are properly considered as evidence." *Rasco v. Ducars Inv*., No. 02-21-00375-CV, 2022 Tex. App. LEXIS 7125, at *20 n.3 (Tex. App.—Fort Worth Sept. 22, 2022, no pet.) (mem. op.). Hearing no objection, the trial court could take the representation about the home being valued in excess of $243,000 as evidence negating Joshua's belief that it had no equity.

Additionally, Joshua received a truck he valued at over $4,000. Haleigh received a Cadillac that, as Joshua acknowledged, had been repossessed and for which she could not pay. Both received one half of Joshua's retirement account. It held over $50,000.

Given Joshua's lack of analysis and the evidence mentioned, we cannot say that Joshua carried his burden.  He did not establish that the trial court acted arbitrarily or unreasonably in dividing the marital estate as it did.

Having overruled each issue, we affirm the Final Decree of Divorce.


Brian Quinn
Chief Justice